IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED

2017 APR 12 PM 4:28

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____

LAURA MORGAN-RINEHART,
Plaintiff,

-vs-

FRED VAN DE PERRE, A BETTER
WAY OF LIFE, INC. D/B/A PLATYPUS
CO., and PARADISE DENTAL
TECHNOLOGIES: PDT, INC.
Defendants.

CAUSE NO.:
A-16-CA-01327-SS

## O R D E R

BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and specifically Defendant A Better Way of Life, Inc. d/b/a Platypus Co. (ABWOL)'s Motion to Dismiss [#24], Plaintiff Laura Morgan-Rinehart (Plaintiff)'s Response [#31] in opposition, and ABWOL's Reply [#38] in support, as well as Defendant Fred Van de Perre (Van de Perre)'s Motion to Dismiss [#25], Plaintiff's Response [#32] in opposition, Van De Perre's Reply [#37] in support, and Plaintiff's Sur-Reply [#43-1] in opposition.[1] Having reviewed the documents, the governing law, and the file as a whole, the Court now enters the following opinion and orders granting the motions to dismiss.

### Background

Plaintiff brings this action alleging ABWOL, Van De Perre, and PDT failed to pay Plaintiff royalties as required under the parties' various licensing and shareholder agreements, and attempted to deprive Plaintiff of her ownership in her patented invention.

---

[1] The Court also considered Plaintiff's Motion for Leave to Permanently Seal Plaintiff's Sur-Reply to Van De Perre's Motion to Dismiss [#43] and Van De Perre's Opposition to Plaintiff's Sur-Reply Memorandum [#46]. The Court hereby GRANTS Plaintiff's Motion for Leave [#43].

## I. Facts

### A. Plaintiff Develops the Prototype.

Plaintiff, a dental hygienist based in Austin, Texas, works primarily with children and orthodontic patients. Am. Compl. [#16] ¶¶ 8–9. After witnessing the problems her patients with braces encountered while flossing, Plaintiff invented a prototype of a flossing device "to combat the increasing risks to her patients from a lack of flossing." *Id.* ¶¶ 9–10. Plaintiff applied for a provisional application for her "Ultimate Orthodontic Floss Aid" (Prototype) with the United States Patent and Trademark Office (USPTO), and on March 14, 2007, she received confirmation of her application. *Id.* ¶ 11. Plaintiff discussed manufacturing the Prototype with a plastics manufacturer in Austin, but never began production due to financial reasons. *Id.* ¶ 12.

### B. Plaintiff and PDT Begin to Work Together.

From May 10 to 12, 2007, Plaintiff attended the annual Texas Dental Association Conference (TDA Conference) in San Antonio, Texas, where she first engaged with Defendant PDT, a Montana-based dental instrument company. *Id.* ¶ 14. Plaintiff alleges PDT has attended the TDA Conference for the past fifteen years to market its dental products. *Id.* At the TDA Conference, Plaintiff met PDT's then-co-owners, Van De Perre and his then-wife Laura Miller. *Id.* ¶¶ 13–14. During their first meeting, Plaintiff shared the general concept for her Prototype and Van De Perre expressed an interest in forming a business relationship. *Id.* ¶ 15. Before any further discussions occurred, Plaintiff and Van de Perre, on behalf of himself and PDT, signed a nondisclosure agreement. *Id.* ¶ 16. Once the agreement was signed, Plaintiff showed Van de Perre a sample of the Prototype. *Id.* Van de Perre confirmed his interest in entering a business relationship with Plaintiff to develop, manufacture, and sell the Prototype. *Id.* ¶ 17.

Later, in June 2007, Van de Perre contacted Plaintiff and asked her to mail him 20 units of the Prototype so he could introduce it to the dental community in Montana and solicit feedback. *Id.* ¶ 18. Plaintiff sent the samples to Van de Perre. *Id.* After considering the feedback, Van de Perre and Plaintiff discussed the design, purpose, production, marketing, pricing, and name of the final product. *Id.* ¶ 19. Van de Perre told Plaintiff he wanted to have the final product ready to market by February 2008. *Id.* ¶ 20.

**C.     Plaintiff and PDT Market and Sell the Platypus Flosser.**

In October 2007, Van de Perre told Plaintiff he wanted to formalize PDT's business relationship with Plaintiff. *Id.* ¶ 21. Accordingly, in November 2007, Van de Perre and Plaintiff entered into a non-exclusive license agreement that allowed PDT to develop, manufacture, market, sell, and/or distribute Plaintiff's product based on the patented Prototype in exchange for a 5% royalty of the Net Selling Price of the product (2007 PDT Agreement). *Id.* ¶ 22. Van de Perre signed the 2007 PDT Agreement on behalf of PDT. *Id.* ¶ 23.

In February 2008, PDT launched the final product in Chicago, Illinois, under the name "Platypus." *Id.* ¶ 24. On February 28, 2008, Van de Perre told Plaintiff approximately 20,000 units of the Platypus flosser had sold during the launch. *Id.* ¶ 25. After the launch, PDT sold the Platypus flosser to stores and dental offices in Texas. *Id.* ¶ 28. Beginning in May 2008, PDT sent monthly royalty checks and sales reports to Plaintiff. *Id.* ¶¶ 26–27. On March 14, 2008, Plaintiff and her attorney Rick Yeager (Yeager) filed a non-provisional patent application for the Platypus flosser with the USPTO entitled "Method and Apparatus for Orthodontic Floss Aid" (Patent). *Id.* ¶ 29. Van de Perre and Plaintiff verbally agreed PDT would pay Yeager's fees for his work on the patent application. *Id.* ¶ 30.

In the fall of 2008, Plaintiff and Van de Perre continued to market and distribute the Platypus flosser. *Id.* ¶ 34. Plaintiff provided interviews, attended trade shows, and visited dental offices in Texas. *Id.* For instance, Van de Perre set up an interview of Plaintiff with *Hygienetown* magazine in Texas, which was published with the title "PDT Invention Borne of Passion" and distributed in Texas. *Id.* ¶ 35. Van de Perre and Plaintiff also attended the American Dental Association's 149th Annual Session (ADA Session) in San Antonio to market the Platypus flosser. *Id.* ¶ 36. On January 31, 2009, *Orthtown* magazine published an article about PDT, stating PDT had sold more than 1.4 million Platypus flossers. *Id.* ¶ 37. However, the sales reports Plaintiff received up until January 2009 stated only 1,096,800 Platypus flossers were sold. *Id.* ¶ 38.

**D.    ABWOL Begins to Market and Sell Platypus Flossers.**

On December 22, 2008, without Plaintiff's knowledge, Van de Perre and his then-wife Miller formed and incorporated Defendant ABWOL to distribute and sell the Platypus flosser. *Id.* ¶ 31. When ABWOL was incorporated, it authorized 50,000 shares of common stock and listed Van de Perre and Miller as shareholders. *Id.* Van de Perre, on behalf of ABWOL, agreed to supply over 7,000 CVS stores with the Platypus flosser. *Id.* ¶ 32. Plaintiff did not receive any royalty payments from ABWOL's sales of the Platypus flosser until 2011. *Id.* ¶ 33.

In October 2009, Plaintiff discovered Van de Perre and Miller were engaged in divorce proceedings. *Id.* ¶ 39. On October 12, 2009, PDT informed Plaintiff that Van de Perre no longer worked there. *Id.* ¶ 40. Later, on November 19, 2009, Miller, on behalf of PDT, and Plaintiff entered into a new license agreement that granted PDT an exclusive license to develop, manufacture, market, sell, and distribute the Platypus flosser in exchange for a 5% royalty on products sold to "the dental professional market" and a 2% royalty on products sold to the

"consumer market" (2009 PDT Agreement). *Id.* ¶¶ 41, 43. The 2009 PDT Agreement states that it supersedes any prior agreements between the parties. *Id.* ¶ 43.

In early September 2010, Van de Perre, now working solely at ABWOL, told Plaintiff for the first time that ABWOL was selling the Platypus flosser. *Id.* ¶ 48. He said he was interested in engaging in a new business relationship with Plaintiff and offered her an equity stake in ABWOL. *Id.* On September 18, 2010, Van de Perre flew to Austin to meet with Plaintiff and her attorney Yeager to discuss a business relationship between Plaintiff and ABWOL. *Id.* ¶ 49. Van de Perre told Plaintiff "Miller was defrauding Plaintiff, was not devoting sufficient business resources to the Platypus flosser, had lost an important deal with CVS and other retailers, and was emotionally and mentally unstable." *Id.* ¶ 50.

After these conversations, Van de Perre sent Plaintiff a proposed Memorandum of Understanding, which states Plaintiff agrees to sell all licensing and patent rights in the Platypus flosser to ABWOL, and ABWOL agrees to transfer 10% equity in ABWOL to Plaintiff (2010 MOU). *Id.* ¶ 51. The 2010 MOU also states ABWOL intended to pay royalties to Plaintiff in an amount "not less than the agreement stipulated in the existing [2009 PDT Agreement] between [Plaintiff] and PDT." *Id.* In addition, the 2010 MOU provides "within 30 days of the official dissolution of Fred and Lina Van de Perre's marriage, [Plaintiff]/ABWOL will finalize this agreement in its entirety." *Id.* ¶ 52.

On October 4, 2011, Van de Perre and Miller finalized their divorce. *Id.* ¶ 56. As part of the divorce agreement, all of Van de Perre's stock in PDT was awarded to Miller, all of Miller's stock in ABWOL was awarded to Van de Perre, and all rights associated with the Platypus flosser were awarded to Van de Perre. *Id.* Plaintiff was not notified of the divorce agreement until "recently." *Id.*

On December 9, 2011, Plaintiff and Van de Perre signed a shareholder agreement (2011 Shareholder Agreement), providing Plaintiff held 100 shares and Van de Perre held 900 shares of the 1,000 issued shares in ABWOL. *Id.* ¶ 59. However, Plaintiff was never listed as a shareholder in ABWOL documents or tax returns, asked to participate in board meetings, or updated about ABWOL's business. *Id.* Plaintiff also never received any distributions or dividends from ABWOL. *Id.* Further, ABWOL's 2011 tax return listed Van de Perre as owning 64.75% of the shares. *Id.* ¶ 61. ABWOL's tax returns from 2012, 2013, and 2014 list Van de Perre as owning 100% of the shares. *Id.* ¶¶ 62–64.

In March 2013, Plaintiff asked Van de Perre to send her certain tax forms required for shareholders. *Id.* ¶ 69. Van de Perre told Plaintiff if she wanted the forms, she would have to be officially listed as a shareholder, and as such would be required to pay 10% of ABWOL's loans, losses, and additional investments. *Id.* He also represented that in 2013 ABWOL had a loss of $140,000. *Id.* ABWOL's 2013 tax return, however, states ABWOL reported a loss of $18,274. *Id.* ¶ 70.

## E.     Plaintiff Assigns Her Patent Rights to ABWOL.

In 2012, Plaintiff's Patent application was still pending. *Id.* ¶ 67. Around that time, Van de Perre told Plaintiff her attorney Yeager was not effectively handling the application and stopped paying Yeager's attorneys' fees. *Id.* Van de Perre explained he thought assigning the Patent to ABWOL would help the Patent application get approved and identified a new attorney, David Johnson, to assist. *Id.* On March 28, 2013, Van de Perre and Plaintiff signed an agreement assigning full and exclusive rights in the Patent to ABWOL for $10.00 (2013 Patent Assignment). *Id.* ¶ 71.

**F.    ABWOL Continues Sales of the Platypus Flosser.**

From 2012 until the present lawsuit, ABWOL continued to sell the Platypus flosser to retail stores and dental offices. *Id.* ¶ 72. At least some of these stores and offices are located in Texas. *Id.* In early 2016, Van de Perre's former assistant Misty Saldana-Williams informed Plaintiff that Van de Perre and ABWOL were lying to Plaintiff about her ownership and interest in ABWOL and that Van de Perre was converting some of ABWOL's assets for his personal use. *Id.* ¶ 73.

**II.    Procedural Background**

Plaintiff filed her Original Petition in state court on November 21, 2016, and Van de Perre and ABWOL timely removed to this Court on December 21, 2016. Not. Removal [#1]. Plaintiff filed her Amended Complaint on January 30, 2017, alleging seven counts against Van de Perre and ABWOL—interference with an existing contract, fraud, statutory fraud, negligent misrepresentation, breach of fiduciary duty, a violation of § 152.202 of the Texas Business and Organizations Code, and unjust enrichment—and requesting declaratory relief against Van de Perre, ABWOL, and PDT. Am. Compl. [#16] ¶¶ 74–127.

On February 17, 2017, Van de Perre moved to dismiss Plaintiff's Amended Complaint for improper venue under the doctrine of *forum non conveniens*, lack of personal jurisdiction, and failure to state a claim. Van de Perre Mot. Dismiss [#25] at 1. In the alternative, Van de Perre moved to transfer the case under § 1404(a). The same day ABWOL filed a motion to dismiss, and in the alternative to transfer, on similar grounds. ABWOL Mot. Dismiss [#24] at 1. These motions have been fully briefed and are now ripe for review.[2]

---

[2] On March 13, 2017, PDT filed a motion to change venue under § 1404(a). PDT's Mot. Change Venue [#39]. Plaintiff responded on March 27, 2017. Resp. PDT Mot. Change Venue [#48]. On April 4, 2017, the Court granted PDT's Unopposed Motion for Extension of Time [#39], directing PDT to file its reply to the motion to change venue by April 17, 2017. Accordingly, PDT's Motion to Change Venue [#39] is not addressed in this Order.

**Analysis**

## I.    Improper Venue

Van de Perre and ABWOL argue venue is improper in this district. Van de Perre claims this case should be dismissed for improper venue (1) under the doctrine of *forum non conveniens* because the 2010 MOU contains an enforceable forum-selection clause, which provides Montana state court is the proper forum, or (2) under 28 U.S.C. § 1406(a) because this Court lacks personal jurisdiction over Van de Perre and ABWOL. Van de Perre Mot. Dismiss [#25] at 15–20. ABWOL joins Van de Perre in arguing the case should be dismissed on *forum non conveniens* grounds. ABWOL Mot. Dismiss [#24] at 2–8. In the alternative, both Van de Perre and ABWOL assert the case should be transferred under § 1404(a). *Id.* at 9–10; Van de Perre Mot. Dismiss [#25] at 17–20.

### A.    *Forum Non Conveniens*

In *Atlantic Marine Construction Co., Inc. v. United States District Court for the Western District of Texas*, the Supreme Court established the legal framework for enforcing forum selection clauses. 134 S. Ct. 568, 580 (2013). The Supreme Court found "the proper mechanism to enforce [a forum selection clause] that calls for litigation in a domestic state court or in a foreign court is through a motion to dismiss on grounds of [*forum non conveniens*]." *Weber v. PACT XPP Techs., AG*, 811 F.3d 758, 766 (5th Cir. 2016) (citing *Atl. Marine*, 134 S. Ct. at 580).

Generally, a court applying the doctrine of *forum non conveniens* must "determine whether there is an adequate alternative forum and, if so, decide which forum is best-suited to the litigation by considering a variety of private- and public-interest factors and giving deference to the plaintiff's choice of forum." *Barnett v. DynCorp Int'l, L.L.C.*, 831 F.3d 296, 300 (5th Cir. 2016). The private factors include: (1) the relative ease of access to sources of proof; (2) the

-8-

availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious, and inexpensive. *In re Volkswagen, AG*, 371 F.3d 201, 203 (5th Cir. 2004). The public factors include: (1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws or applying the foreign law. *Id.*

However, the existence of a forum selection clause alters this analysis in two ways. *Id.* "First, the plaintiff's choice of forum merits no weight," because "the plaintiff has effectively exercised its 'venue privilege' before a dispute arises." *Atl. Marine*, 134 S. Ct. at 580. Second, the "district court may consider arguments about public-interest factors only," because the private-interest factors "weigh entirely in favor of the preselected forum . . . ." *Id.* at 582. Further, a valid forum selection clause is "given controlling weight in all but the most exceptional cases." *Id.* (internal citation omitted).

Therefore, the Court must inquire whether a valid forum selection clause exists and, if one does, then consider the public interest factors of the *forum non conveniens* analysis.

### 1.     The 2010 MOU Includes a Valid Forum Selection Clause.

In analyzing whether a valid forum selection clause exists, the Court first determines whether the clause is mandatory or permissive. *Weber*, 811 F.3d at 766. The Court "must then decide whether the forum selection clause applies to the present case, which involves two separate inquires: (1) whether the contact is valid and the forum-selection clause is enforceable, and (2) whether the present case falls within the scope of the forum-selection clause." *Sabal Ltd.*

*LP v. Deutsche Bank AG*, No. 5:16-CV-300-DAE, 2016 WL 5080385, at \*5 (W.D. Tex. Sep. 19, 2016).[3]

### a.  The 2010 MOU Forum Selection Clause is Mandatory.

"Before this Court decides whether dismissal on *forum non conveniens* grounds is appropriate, it must first decide the threshold question of whether the [] forum-selection clause is mandatory or permissive." *See Saye v. First Specialty Ins. Co.*, No. 3:14-CV-202-M, 2014 WL 1386565, at \*3 (N.D. Tex. Apr. 9, 2014).  To determine whether a forum selection clause is mandatory or permissive, "courts must examine the language of the clause and determine whether or not the forum selection clause evidences an intent of the parties to limit the scope of jurisdiction or venue to a particular forum, or whether an ambiguity exists." *Wolfe v. CareFirst of Maryland, Inc.*, No. 4:09-CV-492, 2010 WL 1998290, at \*3 (E.D. Tex. Apr. 27, 2010).  For a forum selection clause to be mandatory, "the provision must clearly indicate its obligatory nature *and* refer specifically to venue." *Watson v. John K. Burch Co.*, No. CIV.A. 3:02-CV-2555, 2003 WL 21145744, at \*3 (N.D. Tex. May 14, 2003); *see also Bustos v. Dennis d/b/a ISS Benefit Adm'rs, Inv. Ins., Inc. d/b/a ISS Benefit Adm'rs, and S. Nev. Benefit Adm'rs, LLC.*, No. SA-17-CV-39-XR, 2017 WL 1049570, at \*2 (W.D. Tex. Mar. 17, 2017) ("To be mandatory, a forum-selection clause must contain 'exclusive language'; the language must show that the parties intended the named location to serve as the forum for disputes arising out of the contract.").

The 2010 MOU states, "This Agreement shall be construed and interpreted in accordance with the laws of Montana.  Jurisdiction for any legal action arising out of this Settlement Agreement will be in the Montana Fourth Judicial District Court, Missoula County." Van de

---

[3] The Fifth Circuit has found federal law applies to the enforceability of forum-selection clauses, but state law applies to interpretations of the meaning and scope of the forum selection clause. *Barnett*, 831 F.3d at 300; *Weber*, 811 F.3d at 770–71. Because both parties cite Texas law to support their arguments related to the meaning and scope of the 2010 MOU—and do not argue another state's law applies—the Court will apply Texas law.

Perre Supp. Decl. [#26] Ex. 1 (2010 MOU) at 2. Courts have determined clauses with similar "will be" language are mandatory. *See, e.g., Wolfe*, 2010 WL 1998290, at *2 (finding clause stating, "All actions at law or equity arising from or out of this Policy will be brought and maintained in the State of Maryland," was mandatory forum selection clause). Further, the clause here "satisfies the exclusive language requirement because of the word 'any'—'any litigation' means all litigation." *See Bustos*, 2017 WL 1049570, at *2 (finding forum selection cause stating "[a]ny litigation proceeding will be governed by and in the State of Nevada" was mandatory). In addition, the clause identifies a specific forum: the Fourth Judicial District Court in Missoula County. *See Watson*, 2003 WL 21145744, at *3. Because the Court finds this language unambiguously commands that the parties agreed venue would be in the Fourth Judicial District Court in Missoula County, the 2010 MOU forum selection clause is mandatory.[4]

### b. The 2010 MOU Forum Selection Clause is Enforceable.

Forum selection clauses are presumptively valid and enforceable. *Haynsworth v. The Corp.*, 121 F.3d 956, 962 (5th Cir. 1997). Usually, the party disputing enforceability tries to overcome the presumption by showing the clause is "unreasonable under the circumstances," which depends on the following factors:

> (1) the incorporation of the forum selection clause into the agreement was the product of fraud or overreaching; (2) the party seeking to escape enforcement will for all practical purposes be deprived of his day in court because of the grave inconvenience or unfairness of the selected forum; (3) the fundamental unfairness of the chosen law will deprive the plaintiff of a remedy; or (4) enforcement of the forum selection clause would contravene a strong public policy of the forum state.

---

[4] Plaintiff argues in a footnote that Montana state law cannot "be the exclusive forum for all potential claims relating to" the 2010 MOU, because only a federal court can hear claims under the Patent Act, 28 U.S.C. § 1338. Resp. ABWOL Mot. Dismiss [#31] at 3 n.3. First, Plaintiff has not brought any claims under the Patent Act. Second, even if she had, the existence of federal claims that do not fall within the forum selection clause does not make the clause permissive, rather than mandatory. In that hypothetical scenario, the issue would likely be resolved under the enforceability analysis—for instance, Plaintiff could argue her inability to bring claims in the chosen forum was "fundamental unfair" and would "deprive the plaintiff of a remedy." *See Haynsworth v. The Corp.*, 121 F.3d 956, 963 (5th Cir. 1997). At bottom, however, Plaintiff's argument is immaterial to whether the forum selection clause is mandatory.

*Id.* at 963 (internal quotations and citation omitted).

But in this case, Plaintiff does not challenge the enforceability of the 2010 MOU forum selection clause on unreasonableness grounds. Instead, Plaintiff argues, in a footnote, the clause is unenforceable because the 2010 MOU is "merely a memorialization of the parties' discussion to date and an indication of a willingness to negotiate and formalize an agreement in the future." Resp. ABWOL Mot. Dismiss [#31] at 2 n.1. In essence, Plaintiff argues the 2010 MOU is an "agreement to agree," not a valid contract, and the forum selection clause is therefore unenforceable. *Id.*

"To be enforceable, a contract must address all of its essential and material terms with 'a reasonable degree of certainty and definiteness.'" *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 237 (Tex. 2016) (internal citation omitted). Accordingly, "when an agreement leaves material matters open for future adjustment and agreement that never occur, it is not binding upon the parties and merely constitutes an agreement to agree." *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 846 (Tex. 2000). On the other hand, "[a]greements to enter into future contracts are enforceable if they contain all material terms." *McCalla v. Baker's Campground, Inc.*, 416 S.W.3d 416, 418 (Tex. 2013). This is based on the notion that if an agreement to agree contains the material terms of the contract, "courts can determine and enforce the parties' obligations, and concerns about indefiniteness and reasonable certainty do not arise." *Fischer*, 476 S.W.3d at 238.

The 2010 MOU explains Plaintiff will sign the license and patent rights of the Platypus flosser over to ABWOL in exchange for a 10% equity share in ABWOL. 2010 MOU at 1. With regard to Plaintiff's royalties, the agreement stipulates,

ABWOL agrees to negotiate with PDT a continuance of royalties paid to [Plaintiff], by PDT, of not less than the agreement stipulated in the existing agreement between [Plaintiff] and PDT. In the event that the PDT license is terminated, ABWOL will, at its option, either use reasonable efforts to find another licensee for the professional market; or will use best efforts to serve the professional market directly. In either case, [Plaintiff] will be paid a 5% royalty on professional market sales.

*Id.* The agreement also states "Upon execution of this Agreement, and within 30 days of the official dissolution of Fred and Linda Van de Perre's marriage, [Plaintiff]/ABWOL will finalize this agreement in its entirety." *Id.* at 2. Finally, the 2010 MOU includes an integration clause stating, "This Agreement contains the entire agreement between the parties with regard to the matter set forth herein and supersedes any and all prior agreements or negotiations between the parties." *Id.* at 3.

The Court finds the 2010 MOU is "sufficiently definite as to all of the future agreement's essential and material terms . . . ." *Fischer*, 479 S.W.3d at 238. The agreement establishes the general scope of the license: Plaintiff gives ABWOL a license in the Platypus flosser in exchange for a 10% equity stake in ABWOL and royalties. The 2010 MOU also explains the royalty structure. Specifically, ABWOL will negotiate with PDT a royalty "of not less than the agreement stipulated in the existing agreement between [Plaintiff]] and ABWOL," the 2009 PDT Agreement, which provides for 2% royalties from sales to the consumer market and 5% royalties from sales to the dental professional market. *See* 2010 MOU at 1; Am. Compl. [#16] ¶ 41. However, if Plaintiff's agreement with PDT falls through, Plaintiff will receive a 5% royalty from sales to the dental professional market. 2010 MOU at 1.

By citing *Liberto v. D.F. Stauffer Biscuit Co., Inc.*, 441 F.3d 318, 323–25 (5th Cir. 2006), Plaintiff seems to argue the 2010 MOU is lacking an essential term: "the stated [duration] of [the] intellectual property license." Resp. ABWOL Mot. Dismiss [#31] at 2 n.1. Indeed, in

*Liberto*, the Fifth Circuit found a trademark license agreement was unenforceable because the agreement was in the future tense ("Plaintiff *will* grant to Defendant an exclusive license . . . ."); it expressly left open for future negotiation the "specific terms" of the license; it omitted "other terms"; it did not include the effective date of the royalty payments; and it failed to mention the duration of the license. 441 F.3d at 324. But the combination of all of these factors made the agreement unenforceable, not just the fact that the agreement did not include the license's duration. *See id.* at 324–25.

In fact, in *Fluorine On Call, Ltd. v. Fluorogas Ltd.*, 380 F.3d 849 (5th Cir. 2004), the Fifth Circuit found an agreement to agree without a express duration term was an enforceable contract, terminable at will. *Id.* at 855. There, the parties entered into a memorandum of understanding that granted an exclusive license, but did not contain an express duration term. *Id.* at 853. The Fifth Circuit affirmed the district court's decision that "although the [memorandum of understanding] lacks a definite term of duration, it should, nonetheless, be allowed to proceed for a reasonable amount of time." *Id.* Therefore, the Court finds, even without an express term of duration, the 2010 MOU contains the agreement's material terms and is thus enforceable.

Plaintiff also argues language such as "ABWOL agrees to negotiate" and "[Plaintiff]/ABWOL will finalize this agreement" indicates "a willingness to negotiate and formalize an agreement in the future." Resp. ABWOL Mot. Dismiss [#31] at 2 n.1. This, however, is true of all agreements to agree. The standard for determining if an agreement to agree is enforceable is whether the agreement includes all material terms, not whether a willingness to negotiate exists.

In sum, the 2010 MOU contains the necessary material terms and is enforceable.[5]

---

[5] Plaintiff does not argue that because Van de Perre did not sign the 2010 MOU in his individual capacity, he is not bound by it. *See* Resp. Van de Perre Mot. Dismiss [#32] (incorporating by reference Plaintiff's arguments

### c. Plaintiff's Claims Fall Within Scope of 2010 MOU Forum Selection Clause.

Next, the court "look[s] to the language of the parties' contract to determine which causes of action are governed by the forum selection clause." *Braspetro Oil Servs. Co. v. Modec (USA), Inc.*, 240 F. App'x 612, 616 (5th Cir. 2007) (internal citation omitted); *see also Aerus LLC v. Pro Team, Inc.*, No. Civ. A. 3:04–cv–1985–M, 2005 WL 1131093, at *1 (N.D. Tex. May 9, 2005) ("The court must examine the language of the contract to determine which causes of action are governed by the forum selection clause."). "[I]f the *substance* of the[ ] claims, stripped of their labels, does not fall within the scope of the [forum selection clause], the clause[ ] cannot apply." *Chalos & Co., P.C. v. Marine Managers, Ltd.*, No. 14-2441, 2015 WL 5093469, at *4 (E.D. La. Aug. 28, 2015) (internal quotations omitted). Accordingly, a forum selection clause can apply to both contract and tort claims. *See Marinechance Shipping, Ltd. v. Sebastian*, 143 F.3d 216, 222 (5th Cir. 1998) ("We find no persuasive support for [a contract/tort] distinction."); *see also JetPay Merch. Servs., LLC v. Merrick Bank Corp.*, No. 3:13-CV-3101-L-BN, 2014 WL 798373, at *2 (N.D. Tex. Feb. 28, 2014) ("The scope of a forum selection clause is not limited solely to claims for breach of the contract that contains it.")

Here, the 2010 MOU forum selection clause states, "Jurisdiction for any legal action *arising out of* this Settlement Agreement will be in the Montana Fourth Judicial District Court, Missoula County." 2010 MOU at 2 (emphasis added). At its core, the 2010 MOU is a license agreement that establishes the scope of Plaintiff's equity ownership in ABWOL as well as ABWOL's ownership of the licensing and patent rights of the Platypus flosser. "In other words, the spirit of the [2010 MOU] contemplates the rights and duties of the parties concerning the

---

addressing *forum non conveniens* from her response to ABWOL's Motion to Dismiss). Thus, the Court assumes both parties agree Van de Perre is bound by the 2010 MOU. *See Harland Clarke Holdings Corp. v. Milken*, 997 F. Supp. 2d 561, 581–82 (W.D. Tex. 2014) (explaining contract theories, such as agency or direct benefits estoppel, can bind non-signatories to a forum selection clause).

[Platypus flosser.]" *Laserdynamics, Inc. v. Acer Am. Corp.*, 209 F.R.D. 388, 391 (S.D. Tex. 2002).

As an initial matter, the parties disagree whether the 2010 MOU's forum selection clause should be interpreted broadly or narrowly. "Clauses that extend only to disputes 'arising out of' a contract are construed narrowly, while clauses extending to disputes that 'relate to' or 'are connected with' the contract are construed broadly." *Wellogix, Inc. v. SAP Am., Inc.*, 58 F. Supp. 3d 766, 778 (S.D. Tex. 2014); *see also JetPay Merch. Servs., LLC*, 2014 WL 798373, at *3 ("Forum selection clauses that cover disputes 'arising from' an agreement are viewed as relatively narrow. By contrast, forum selection clauses covering claims 'relating to' an agreement are broad in scope.") (internal citation omitted).[6] Thus, the Court will construe the 2010 MOU forum selection clause narrowly.

Even under a narrow interpretation, however, the Court finds Plaintiff's claims "arise out of" the 2010 MOU and are therefore governed by the forum selection clause. Although the Fifth Circuit has not articulated a specific test for determining when claims fall within the scope of a forum selection clause, district courts within this circuit usually look to three rules: (1) whether the tort claims "ultimately depend on the existence of a contractual relationship between the parties"; (2) whether "resolution of the claims relates to interpretation of the contract"; and (3) whether the claims "involv[e] the same operative facts as a parallel claim for breach of contract." *AlliantGroup, L.P. v. Mols*, No. CV H-16-3114, 2017 WL 432810, at *7 (S.D. Tex. Jan. 30, 2017) (internal citation omitted); *see also Chalos & Co., P.C.*, 2015 WL 5093469, at *5 (applying three rules to forum selection clause stating, "[a]ny dispute arising out of the

---

[6] ABWOL argues forum selection clauses "that contain phrases like 'arising out of' an agreement 'are broad in scope.'" ABWOL Mot. Dismiss [#24] at 5. But the cases ABWOL cites for support involve forum selection clauses that apply to disputes "arising out of *or relating to*" an agreement. *See, e.g., JetPay Merch. Servs., LLC*, 2014 WL 798373, at *3; *Harland Clarke Holdings Corp.*, 997 F. Supp. at 561. The Court agrees clauses with both "arising out of" and "relating to" language are construed broadly, but that is not the case here.

interpretation or the performance of this Contract"); *Pinnacle Interior Elements, Ltd. v. Panalpina, Inc.*, No. 3:09–cv–430–G, 2010 WL 445927, at *5 (N.D. Tex. Feb. 9, 2010) (internal citation omitted) (holding when a plaintiff raises tort claims, the applicability of a contractual forum selection clause to those claims "depends on whether resolution of the claims relates to interpretation of the contract"); *Columbia Energy Servs. Corp. and Enron N.A. Corp. v. TDC Energy Corp.*, No. CIV. A. 01-0055, 2002 WL 272382, at *4 (E.D. La. Feb. 25, 2002) ("If this Court has to interpret" the contract, the plaintiffs' breach of contract and detrimental reliance claims "arise[] out of the [contract], and the forum selection clause is applicable.").

Plaintiff brings eight claims against Van de Perre and ABWOL. Because all of these claims arise out of the 2010 MOU, they fall within the scope of the forum selection clause.

### i.     Count One

Count One alleges Van de Perre and ABWOL interfered with the 2007 PDT Agreement and the 2009 PDT Agreement. Am. Compl. [#16] ¶¶ 74–78. Plaintiff states, Van de Perre "actively made representations to Plaintiff to convince Plaintiff to engage in business with him by suggesting that [Linda Perre of PDT] was defrauding Plaintiff, was not devoting sufficient business resources to the Platypus flosser, had lost an important deal with CVS and other retailers, and was emotionally and mentally unstable." *Id.* ¶ 50. As Plaintiff admits in her Amended Complaint, these representations resulted in the 2010 MOU: Van de Perre and Plaintiff entered into the 2010 MOU "[i]n order to memorialize their discussions . . . ." *Id.* ¶ 51. Accordingly, the 2010 MOU was the means by which ABWOL allegedly interfered with Plaintiff's relationship with PDT. Because this alleged interference relies on the existence of

Plaintiff and ABWOL's relationship established in the 2010 MOU and relates to interpretation of the 2010 MOU, Plaintiff's tortious interference claim arises out of the 2010 MOU.[7]

Plaintiff argues the forum selection clause does not apply because some of the alleged acts of interference took place before the execution of the 2010 MOU. Resp. ABWOL Mot. Dismiss [#31] at 4–5. But the Fifth Circuit has held forum selection clauses apply to tort claims even when the alleged tortious acts occurred before the parties entered into the agreement. *See Braspetro Oil Servs.*, 20. F. App'x at 616 (finding plaintiffs' argument that alleged fraudulent acts occurred before the execution of the contract and therefore did not arise out of the contract was "foreclosed by our circuit's precedent") (citing *Haynsworth*, 121 F.3d at 960–61); *see also Tex. Source Grp., Inc. v. CCH, Inc.*, 967 F. Supp. 234, 237–38 (S.D. Tex. 1997) (finding allegedly false misrepresentations made before execution of the contract "ar[o]se under" the contract because they were "undoubtedly related to the genesis of the Agreement . . . .); *Pinnacle Interior Elements, Ltd*, 2010 WL 445927, at *6 (Even though the fraudulent inducement and negligence misrepresentation claims "pertain to statements made by [the defendant] during the course of the negotiations that led up to the signing of the contract[,] . . . they are within the scope of the forum-selection clause . . . ."). Therefore, because the Court finds Plaintiff's tortious inference claim arises out of the 2010 MOU and the relationship it created, it is governed by the 2010 MOU's forum selection clause.

---

[7] One of Plaintiff's arguments against applying the forum selection clause to her claims is that the 2010 MOU is only one example of Van de Perre and ABWOL's alleged interference, fraud, misrepresentation, and/or breach of duty. *See, e.g.,* Resp. ABWOL's Mot. Dismiss [#31] at 4 ("[I]t was not solely the execution of the 2010 [MOU] that constituted Defendants' interference."); *id.* at 5 ("The 2010 Memorandum was but one of the artifices of the fraud."); *id.* at 5 ("[I]t was [Van de] Perre's solicitations and visit to Texas and his continuing promises that formed the business partnership relationship with Plaintiff, not simply the 2010 [MOU]."). However, Plaintiff does not provide any authority that, for a tort claim to fall within a forum selection clause, it must arise *solely* from the contract. There may be other examples of Van de Perre and ABWOL's alleged interference with Plaintiff's agreements with PDT, but because Plaintiff's inference claim relies on the existence of Plaintiff and ABWOL's contractual relationship and relates to interpretation of the 2010 MOU, it falls within the scope of the forum selection clause.

### ii. Counts 2, 3 and 4

Plaintiff's claims for fraud, statutory fraud, and negligent representation also arise out of the rights and obligations of the parties established by the 2010 MOU. "These claims are specifically premised on [Van de] Perre and ABWOL's actions through the present in using false promises to make Plaintiff a partner and owner in ABWOL to get her to transfer her ownership in her intellectual property to AWBOL." Resp. ABWOL's Mot. Dismiss [#31] at 5. Specifically, Plaintiff states in her Amended Complaint,

> [Van de Perre and ABWOL] made material, [false] representations to Plaintiff regarding [their] intent to make her an owner of ABWOL, Plaintiff's duties, rights, and obligations with regard to ABWOL as an owner and the ownership of the Platypus flosser invention, the amount of sales in the Platypus flosser, and the nature of Defendants' relationship with Plaintiff and with others, including stockholders of ABWOL.

Am. Compl. [#16] ¶¶ 79–80. Plaintiff also claims she "acted in reliance upon the material representations" by agreeing to the 2010 MOU. *Id.* ¶¶ 52–53, 82–83.

The parties' duties and obligations discussed in Plaintiff's Amended Complaint are specifically addressed in the 2010 MOU. 2010 MOU at 1–3; *see also* Am. Compl. [#16] ¶ 53 ("Because of Defendant Perre's representations, and the language of the 2010 Memorandum . . . Plaintiff believed she would become an equity owner in Defendant ABWOL . . . [and] would continue to receive 5% royalties from sales to the dental professional market and 2% royalties from sales to the consumer market . . . ."). Therefore, any alleged misrepresentations regarding the duties and obligations of Plaintiff and ABWOL depend on the contractual arrangement established in the 2010 MOU. Further, the allegation that Van de Perre and ABWOL made fraudulent statements and misrepresentations necessarily requires the Court to interpret provisions of the 2010 MOU, for example, the integration clause that disclaims all prior agreements and negotiations. Thus, as with her tortious interference claim, Plaintiff's claims for

fraud, statutory fraud, and negligent representation fall within the forum selection clause. *See Claimserviceprovider, Inc. v. St. Paul Travelers Cos. Inc.*, No. 06-2474, 2006 WL 2989240, at *5–6 (E.D. La Oct. 18, 2006) (finding forum selection clause applied to plaintiffs' misrepresentation and negligence claims because they "ar[o]se under" the contracts at issue); *Chalos & Co., P.C.*, 2015 WL 5093469, at *5–6 (finding forum selection clause applied to fraudulent inducement claim because it arose out of the contract).

### iii.    Counts 5, 6, and 7

Plaintiff also brings claims for breach of fiduciary duty, violation of Texas Business and Organization Code § 152.202, and unjust enrichment. These claims all rely on the relationship the 2010 MOU established between ABWOL and Plaintiff and interpretation of that agreement. For instance, Plaintiff's breach of fiduciary duty claim is predicated on the alleged existence of a fiduciary relationship between Plaintiff and ABWOL as partners. Similarly, the 2010 MOU will be instrumental in establishing Plaintiff and ABWOL's partnership for purposes of Plaintiff's § 152.202 claim. Both claims related to interpretation of the 2010 MOU regarding the parties' relationship. Finally, in her unjust enrichment claim, Plaintiff alleges "Defendants accepted the intellectual property, purported to enter into an agreement or agreements with Plaintiff to market and sell the Platypus flosser, and did market and sell the Platypus flosser to the professional and consumer markets." Am. Compl. [#16] ¶ 119; *see also id.* ¶ 58 ("ABWOL did not pay Plaintiff royalties for sales to the consumer markets despite the fact that the 2009 PDT Agreement provided for sales to the consumer market and the 2010 [MOU] had expressly incorporated the 2009 PDT Agreement royalty stream."). Again, these obligations and duties are established in the 2010 MOU and relate to interpretation of that contract. For these reasons, the forum selection clause applies to Counts 5, 6, and 7.

### iv.    Count 8

Plaintiff requests declaratory relief in Count 8. Because this relief directly stems from her claims in Counts 1 through 7—causes of action that fall within the forum selection clause—Plaintiff's declaratory judgment claim against Van de Perre and ABWOL also arises from the 2010 MOU and is therefore covered by the forum selection clause.

### 2.    Public Interest Factors

In light of the existence of a valid forum selection clause, the Court considers only the public interest factors of the *forum non conveniens* analysis. *Atl. Marine*, 134 S. Ct. at 583. The public factors include: (1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws or applying the foreign law. *Id.* at 580. "Because those factors will rarely defeat a transfer motion, the practical result is that forum-selection clauses should control except in unusual cases." *Id.* at 583. "[S]uch cases will not be common." *Id.* This language from *Atlantic Marine* "suggests quite a high burden of persuasion on the party seeking to avoid enforcement of" a forum selection clause. *Weber*, 811 F.3d at 776.

Here, Plaintiff has not met that burden. Plaintiff admits the District of Montana has "a slightly lower case load" than the Western District of Texas. Resp. ABWOL's Mot. Dismiss [#31] at 7. However, neither party discusses the administrative congestion of the Montana state court discussed in the forum selection clause. The Court finds the first factor is neutral.

Next, "when considering the local interest factor, the court must look to the relevant factual connection between the events at issue and the two proposed venues." *Auto–Dril, Inc. v. Pason Sys. USA Corp.*, No. 6:15-CV-00093, 2015 WL 12780768, at *2 (W.D. Tex. May 22,

2015).  Plaintiff argues this district has a local interest because Plaintiff is a Texas citizen "injured by a foreign defendant's actions directed to her in Texas."  Resp. ABWOL's Mot. Dismiss [#31] at 8.  However, Montana courts also have a local interest: ABWOL is a corporation organized under Montana's laws with its principal place of business in Montana and Van de Perre is a resident of Montana.  Am. Compl [#16] ¶¶ 3–4.  *See Auto-Dril, Inc.*, 2015 WL 12780768, at *2 ("The district where a party has its principal place of business typically has a stronger local interest in the adjudication of the case.").  The Court finds this factor is neutral.

The third and fourth factors are also neutral.  The Court is confident this Court or a Montana state court could apply Montana or Texas law.  The parties do not make any arguments to the contrary.

In sum, Plaintiff has not established this is an extraordinary case where the public interest factors outweigh the 2010 MOU's valid forum selection clause.

## Conclusion

For the foregoing reasons, the Court determines this case must be dismissed for *forum non conveniens*.  Because venue is improper under *forum non conveniens*, the Court need not address Van de Perre and ABWOL's arguments for dismissal based on lack of personal jurisdiction[8] and failure to state a claim, or for transfer based on 28 U.S.C. § 1404(a).

Accordingly,

IT IS ORDERED that Plaintiff's Motion for Leave to Permanently Seal Plaintiff's Sur-Reply to Van De Perre's Motion to Dismiss [#43] is GRANTED;

IT IS FURTHER ORDERED that Defendant A Better Way of Life, Inc.'s Motion to Dismiss for *Forum Non Conveniens* [#24] is GRANTED;

---

[8] The parties should note that the record strongly suggests this Court has personal jurisdiction over all of the parties in this case.

IT IS FURTHER ORDERED that Defendant Fred Van de Perre's Motion to Dismiss for *Forum Non Conveniens* [#25] is GRANTED; and

IT IS FINALLY ORDERED that all claims brought by Plaintiff Laura Morgan-Rinehart against Defendants Van de Perre and A Better Way of Life, Inc., are DISMISSED WITHOUT PREJUDICE.

SIGNED this the ___12th___ day of April 2017.

_____
SAM SPARKS
UNITED STATES DISTRICT JUDGE